**B.C.F. OIL REFINING, INC., Plaintiff,**

v.

**CONSOLIDATED EDISON COMPANY OF NEW YORK, INC., et al., Defendants.**

**No. 94 CIV. 8499(CBM).**

United States District Court, S.D. New York.

Nov. 10, 1997.

Julian Friedman, Michael Grudberg, Stillman· & Friedman, New York, NY, for Plaintiff.

Mathew P. Ross, Wilson, Elser, Moskowitz, Edelman & Dicker, New York, NY, for Defendant Miller Environmental Group, Inc.

Charles McTiernan, James Dixon, Consolidated Edison Legal Department, New York, NY, for Defendant Consolidated Edison Co.

### OPINION ON MOTION OF MILLER ENVIRONMENTAL GROUP, INC. FOR SUMMARY JUDGMENT

### OPINION

MOTLEY, District Judge.

Plaintiff, BCF Oil Refining, Inc. [BCF], formerly an oil refining company, brings this action against defendant, Consolidated Edison Company of New York, Inc. [Con Edison], alleging that Con Edison distributed contaminated oil to plaintiff in violation of, *inter alia,* the Toxic Substances Control Act. 15 U.S.C. § 2619. Plaintiff has also brought state law claims under the doctrine of supplemental jurisdiction against defendant, Miller Environmental Group, Inc. [MEG], the transporter company which delivered the allegedly contaminated waste oil from Con Edison to BCF. 28 U.S.C. § 1367(a).

After discovery in this case was completed, MEG filed a motion for summary judgment, arguing there is no genuine issue of material fact as to whether it was negligent or breached any warranties with respect to BCF. After oral argument on the motion on October 30, 1997, this court entered an order granting the motion, noting that this opinion would follow.

Since this court finds and concludes that no reasonable trier of fact could find that MEG breached its duty of reasonable care to BCF under the circumstances of this case or breached any express or implied warranty,

# 304

BCF's case against MEG is DISMISSED IN ITS ENTIRETY.

## I. FACTUAL BACKGROUND

The following facts are not in dispute: BCF owned and operated a facility in Brooklyn, New York for the receipt and resale of waste oil and the disposal of waste water from its various customers. BCF's primary business objective was to extract the waste oil portion of any delivery and, after reprocessing, sell it as heating oil. Waste oil and water were brought to BCF's facility by independent transporters who collected these liquid wastes from numerous sources. When a transporter's truck arrived, BCF's chemist would test the waste to determine the relative concentrations of oil and water. If the waste oil had a concentration less than 5% by volume, it was considered waste water. BCF would then charge the waste water originator a fee in order to dispose of it. If the concentration of waste oil was greater than 5%, BCF would pay the waste oil originator for the oil, since this was the material BCF used to manufacture reprocessed heating oil.

BCF did not operate as a facility permitted to receive hazardous waste. Under a federal court consent decree to which BCF and the federal Environmental Protection Agency [EPA] were parties, BCF was expressly prohibited from accepting oil which contained polychlorinated biphenyls [PCBs], a hazardous product, in concentrations greater than 50 parts per million (ppm). Moreover, the EPA required plaintiff to undertake a variety of testing procedures. BCF was required to test all liquid waste oil which arrived at its facility using what is known as the Dexsil PCB test kit.[1] Waste water was not tested because PCBs are insoluble in water and cannot, therefore, be found in aqueous solutions at concentrations near 50 ppm.

In addition to the Dexsil test requirement, samples from 5% or more of incoming oil loads were sent to a certified independent laboratory. The independent laboratory examined the materials, using a much more accurate technique known as gas chromatography ("GC"). Finally, the EPA required plaintiff to send a sample of its finished oil product each week to the same independent laboratory for GC testing.

On April 8, 1994, as usual, a sample from BCF's finished oil product was sent to an independent laboratory for testing. Although the prior sample, taken on April 1, had tested within acceptable parameters for PCBs, the April 8 sample reflected PCB levels well in excess of 2,000 ppm. In light of this highly unusual result, BCF ordered another test, which yielded the same result. When BCF's president was informed about this in mid-May, 1994, he had no choice but to cease all sales of oil and disclose all that he knew to the EPA.

BCF filed this suit alleging that Con Edison had violated the Toxic Substance Control Act by causing oil with high concentrations of PCBs to be delivered to BCF on 25 separate occasions between March 29 and May 18, 1994. BCF also alleged that Con Edison was liable for negligence and breach of warranty. Finally, suit was brought against several transporters, including MEG, for negligence, breach of warranty, and fraud. By Memorandum Opinion dated February 14, 1997, 1997 WL 66777, this court granted, in part, and denied, in part, a motion for summary judgment made by all defendants. It ruled that BCF had raised triable issues of fact only as to the April 6, 1994 delivery from Con Edison to BCF via the transporter MEG.

For purposes of the instant motion the following facts are also not actually disputed: the April 6 shipment was comprised of cleanup from two sites; on April 5, 1994, an MEG employee assisted in the clean-up of a Number 6 fuel oil leak at Con Edison's site at Kent Avenue and Twelfth Street in Brooklyn; on April 6, 1994, another MEG employee cleaned an oil/water separator at Con Edison's site in Astoria, Queens. The court is also presently assuming for the purposes of this motion that in one or both of those shipments there was hazardous waste. However, it is undisputed that No. 6 fuel oil does

---

1. See Pl. B.C.F. Oil Refining, Inc's Mem. of Law in Opp. to Def. MEG's Mot. for Summ. J., 5 n3;

Tr., 24. "Tr." refers to the transcript of the oral argument of this motion on October 30, 1997.

not contain PCBs[2], and that water cannot contain PCBs in concentrations approaching 50 ppm. It is also undisputed BCF did not perform the required Dexsil test on the materials in the April 6 shipment.[3]

## II. CONCLUSIONS OF LAW

### A. Standards for Granting Summary Judgment

"Uncertainty as to the true state of any material fact defeats [a summary judgment] motion." *Gibson v. American Broadcasting Co.*, 892 F.2d 1128, 1132 (2d Cir.1989). It is not the role of the trial court to weigh the evidence presented or to resolve any factual issue, but rather it is the court's job to determine whether, after the parties have conducted adequate discovery, any such issues remain to be tried. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986); Fed.R.Civ.P. 56(c). A factual issue is unresolved if a reasonable fact finder could determine in favor of either party. *See Anderson*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986); *Gibson*, 892 F.2d at 1132. Moreover, [t]he court must view the inferences to be drawn from the facts in the light most favorable to the non-movant. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *Eastway Constr. Corp. v. City of New York*, 762 F.2d 243, 249 (2d Cir.1985). The non-moving party may defeat the motion for summary judgment by producing sufficient facts to establish a genuine issue of material fact for trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986).

### B. Negligence—New York Law

BCF's first state law claim against MEG is a claim that MEG was negligent with respect to its transportation of the April 6, 1994 shipment to BCF's facility in Brooklyn.

To support a claim for negligence, a plaintiff must make a showing of three basic elements: (1) a duty of reasonable care owed by the defendant to the plaintiff; (2) a breach of that duty; and (3) injury to plaintiff which proximately results from the breach. *See Akins v. Glens Falls City School Dist.*, 53 N.Y.2d 325, 441 N.Y.S.2d 644, 648, 424 N.E.2d 531, 535 (Ct.App.1981). The standard of care for "any ... alleged tortfeasor" is "ordinary care commensurate with the existing circumstances." *Stagl v. Delta Airlines, Inc.*, 52 F.3d 463, 471 (2d Cir.1995) (citation omitted). This court holds that, under the circumstances of this case, MEG, the transporter of goods, owed BCF a duty of reasonable care, but that there is no evidence from which a reasonable juror could find that that duty was breached.

BCF's basic claim is that in order for MEG to comply with its duty of reasonable care under the circumstances off this case, MEG should have tested the contents of the April 6, 1994 shipment, notwithstanding its knowledge that before the shipment would be accepted by BCF, BCF's chemist would perform the necessary tests and that Con Edison, which had the duty not to ship hazardous materials to BCF, also had testing facilities at its Astoria facility[4]. BCF is suing

---

2. The dispute revolves around the composition of the April 6, 1994 shipment from Con Edison to BCF; i.e., whether it was, in fact, fuel oil containing PCBs.

3. *See Tr.*, 25.

4. The court closely questioned BCF during oral argument as to BCF's position as to how MEG could satisfy the standard of reasonable care in this case. *See Tr.*, 26, 30–32, 36–38. Although BCF made nebulous references to steps short of testing that MEG could perform, it conceded that, short of testing, one could not determine whether oil contained PCBs. *See Tr.*, 40:

> THE COURT: You are arguing that it was unreasonable for MEG to rely on the need for

Con Edison to test, the need for your client [BCF] to test, they couldn't reasonably rely on that, that is what you are saying; is that right?
Mr. GRUDBERG: Under the tort law analysis, yes, your Honor, we do think it is unreasonable for them to completely discharge any independent responsibility by relying, on the one hand, on Con Edison being a regulated party and, on the other hand, on B.C.F., the disposal facility being regulated.

In addition, BCF conceded that testing was the only way to know that any given material is devoid of hazardous waste. *See Tr.*, 38:

> Mr. GRUDBERG: I think it is fair to say that MEG knew that Con Edison had a duty not to

here to make MEG pay a portion of the damages BCF incurred when it, BCF, contaminated its entire facility by dumping oil containing 2,000 ppm's of PCBs into its tanks.

This court finds and concludes that such a testing requirement, under the circumstances of this case, would place on MEG a higher standard of care than the standard of reasonable care under the circumstances of this case.

### 1. Duty owed by the MEG.

"The question of whether a member or group of society owes a duty of care to reasonably avoid injury to another is of course a question for the courts." *Tenuto v. Lederle Labs.*, 90 N.Y.2d 606, 612, 665 N.Y.S.2d 17, 19, 687 N.E.2d 1300, 1302 (Ct. App.1997) (citation omitted). The determination of the existence *vel non* of a duty is the court's first step in a negligence case. *See Pulka v. Edelman*, 40 N.Y.2d 781, 782, 390 N.Y.S.2d 393, 395, 358 N.E.2d 1019, 1020 (Ct.App.1976) ("In the absence of duty, there is no breach and without a breach there is no liability.").

In determining whether there is a duty, courts balance factors, "including the reasonable expectations of the parties and society generally, the proliferation of claims, the likelihood of unlimited or insurer–like liability, disproportionate risk and reparation allocation, and public policies." *Palka v. Servicemaster Mgt. Servs. Corp.*, 83 N.Y.2d 579, 611 N.Y.S.2d 817, 821, 634 N.E.2d 189, 193 (Ct.App.1994). The sources of duty are decisional law (i.e., judicial imposition of a duty

based on what a reasonable person would do); custom and usage; statutes and ordinances; and relationship of the parties. *See* 1 Miller, *New York Practice Guide: Negligence* ¶ 2.03 (1989 & Supp.1997).

The court finds that, as MEG conceded during oral argument, defendant MEG does owe a duty of reasonable care to BCF.[5] The lack of actual privity of contract does not mean that the transporter company does not have a meaningful, commercial relationship with plaintiff BCF. To hold MEG to a lesser standard than reasonable care would undermine BCF's reasonable expectation of care from the parties with which it deals in its regular operations. To hold MEG to a standard of care higher than reasonable, ordinary care, on the other hand, would give misdirected weight to the regulations which govern the parties' dealings with hazardous goods.

It is undisputed that MEG did have a "364 permit" which prohibited it from transporting hazardous materials to BCF's facility.[6] BCF had a corresponding "360 permit" which prohibited it from accepting shipments with hazardous waste.[7] In order to insure that BCF did not accept oil whose concentration of PCBs exceeded 50 ppm, BCF had obligations pursuant to a permit issued by the New York State Department of Environmental Conservation [DEC]. *See Roarke Aff.,* L, M. However, the existence of environmental protection regulations (§ 364.1) prohibiting MEG from transporting hazardous waste (and BCF from accepting such waste) does not, without more, create a higher duty on MEG's part, bordering on strict liability,

---

ship hazardous PCB's off its premises, and as your Honor pointed out—
THE COURT: And the only way they would know is by testing?
Mr. GRUDBERG: Is by testing.

5. *See Tr.,* 15.

6. *See* 6 N.Y. Comp.Codes R. & Regs. tit. 6, § 364.1 ("It is the purpose of this Part to protect the environment from mishandling and mismanagement of all regulated waste transported from the site of generation to the site of ultimate treatment, storage or disposal."). "BCF was not a facility to which MEG was permitted to transport oil containing PCBs in concentrations of 50 ppm or greater." *Joint Pretrial Order,* 7.

7. The 360 permit required BCF to make routine tank inspections and to comply with various reporting requirements. The permit required weekly sampling of BCF's post-processing finished product for testing using the gas chromatography method. The permit also required BCF to test every load for certain hazardous materials and to test at least five percent of its incoming materials for PCBs. The 360 permit stated that it did not relieve the permittee of obligations pursuant to other federal, state or local laws. Thus, the permit did not profess to relieve BCF of its obligations to test all incoming shipments for PCBs pursuant to BCF's agreement with the EPA.

to assure that no hazardous waste was delivered. Instead, defendant MEG's duty was to take reasonable care to ensure that it did not transport hazardous materials to BCF.

### 2. Foreseeability on the part of MEG.

In determining the scope of one's duty to use reasonable care, reasonable foreseeability constitutes a part of the inquiry. *See Di Ponzio v. Riordan*, 89 N.Y.2d 578, 657 N.Y.S.2d 377, 379, 679 N.E.2d 616, 618 (Ct. App.1997) ("Foreseeability of risk is an essential element of a fault—based negligence cause of action ... and the law draws a line between remote possibilities and those that are reasonably foreseeable."). The question, therefore, is whether MEG could reasonably have foreseen that Con Edison's Twelfth Street, Brooklyn and Astoria, Queens sites (where MEG cleaned up No. 6 oil and waste water) contained PCBs. It is undisputed that No. 6 oils do not contain PCBs and that PCBs are not soluble in water to the level of 50 ppm.

■ This court finds and concludes that no reasonable juror could find that the requirement of foreseeability, under the facts of this case, placed on MEG the duty to test for PCBs at the Astoria and Brooklyn sites. It would be unreasonable to find that MEG, after six weeks of dealing with BCF and Con Edison, as transporter of numerous loads of oil and water without incident, could reasonably have foreseen the damage to BCF's facility which apparently was caused by BCF dumping oil with 2000 ppm of PCBs from untested oil waste on April 6.

### 3. Breach of the duty of reasonable care by MEG.

"[S]ummary judgment is highly unusual in a negligence action where the assessment of reasonableness generally is a factual question to be addressed by the jury.... Summary judgment, however, is nonetheless appropriate when the non-moving party has failed to set forth any facts that go to an essential element of the claim." *King v. Crossland Savings Bank*, 111 F.3d 251, 259 (2d Cir. 1997). Here BCF's basic contention is that MEG had a duty to test the April 6, 1994 load for PCBs, notwithstanding its knowledge that Con Edison and BCF both had legal obligations to test a shipment sent or received.

BCF concedes that whereas Con Edison (the waste originator) and BCF (the waste recipient) had statutory and/or regulatory duties to ascertain the composition of the materials with which they worked, defendant MEG had no independent statutory duty to test the materials it transported. BCF also does not dispute that defendant MEG picked up materials from Con Edison that were presented to it as waste water and Number 6 fuel oil, neither of which could have contained PCBs in concentrations greater than 50 ppm.

■ What BCF does argue is that since defendant MEG knew that Con Edison's sites were subject to contamination and MEG knew that BCF could not accept hazardous materials, MEG breached a duty of reasonable care. In oral argument, BCF suggested that a jury could find that compliance with a duty of care could entail testing or perhaps some form of additional inquiry of or assurances from Con Edison as to the nature of the waste which MEG cleaned up. However, the fact remains that MEG did not have to test the composition of its shipments whereas both the company from which it gathered the material and the company to which it delivered the material were subject to statutory and/or regulatory duties to test materials. BCF makes much of the fact that it was not required to test waste water once it was determined to be waste water and that its DEC permit did not require complete testing of every part of every shipment. However, the specifics of the type of testing that BCF was required to perform, and the underlying questions about scientific certainty it raises, are somewhat beside the point given that BCF, and not MEG, did have a duty to test. Moreover, if BCF is arguing that it, itself, was not negligent in thinking that Dexsil kit testing was unnecessary on the MEG shipment, it is hard pressed to argue that a jury could impose an extra-statutory duty on MEG to test this load. Finally, the DEC Part 360 permit was not the only source of BCF's obligations; BCF had a number of testing requirements pursu-

ant to its federal court consent decree with the EPA.

This court finds and concludes that no reasonable juror could find that MEG, which cleaned up material from Number 6 fuel oil and waste water areas, and which had no independent duty to categorically second guess the originator's assessment of the materials, breached a duty of reasonable care under the circumstances.

Aside from the implausible argument that a jury might impose a duty which the government in a heavily-regulated industry did not and vague assertions about possible questioning of Con Edison workers about the 'real' composition of materials presented to MEG as waste water and Number 6 fuel oil, BCF has presented no facts suggesting that MEG could· have breached a duty of reasonable care.

### 4.  Proximate Cause.

MEG argues that even if a duty to BCF is found, there can be no liability for MEG because, as a matter of law, BCF's own failure to adequately test the shipment was a superseding cause, thus eliminating the need for a foreseeability inquiry. *See Miller Env. Group, Inc.'s Mot. for Summ. J.,* 15. However, the court does not reach this question because it holds, as a matter of law, that no reasonable jury could find that MEG breached its duty of reasonable care under the circumstances.

### C.  Warranties

BCF's complaint alleges that MEG breached express and implied warranties. BCF argues that express warranties were created in two ways. First, BCF, itself, caused an unloading ticket to be prepared in connection with deliveries by MEG which was signed by MEG's agent. The statement signed by MEG's agent read, *inter alia,* "I certify that the contents of the product represented by this document does not *knowingly* contain PCB's." (Emphasis added.) Second, MEG also provided its own 'manifest' which stated that, "I hereby certify that the above waste description is complete and accurate, and that no component exist [sic] in the wastes which render it hazardous."

BCF has also urged the judicial imposition of an implied warranty of fitness due to MEG's knowledge of the purpose for which BCF was to use the waste oil products. BCF argues that it relied on both warranties to accept the goods.

MEG rejoins that not only was the transaction between BCF and MEG one of service provision (and, therefore, not subject to warranty analysis) but, also, that BCF could not have relied on the warranty precisely be- ·cause BCF personnel drew a sample of the liquid from the April 6 shipment, examined its composition (although BCF did not, contrary to its usual practice, test the sample for PCBs), and accepted the shipment *before* BCF's unloading ticket was prepared.

■  As an initial matter, the court notes that under New York law "all transactions where `service predominates" are indeed immune from express and implied warranty analysis. *Stafford v. Int'l Harvester Co.,* 668 F.2d 142, 146 (2d Cir.1981); *see also Milau Assoc., Inc. v. North Ave. Dev. Corp.,* 42 N.Y.2d 482, 486, 398 N.Y.S.2d 882, 368 N.E.2d 1247 (Ct.App.1977) ("The express warranty section [of the U.C.C.] would therefore be no more applicable to a service contract than the code's implied warranty provisions."). In the present matter, MEG performed the service of delivering waste oil and waste water from various sites to BCF. BCF would either charge or credit Con Edison's account, depending on whether the shipment was wastewater (which BCF had to dispose of) or waste oil (which BCF could reprocess for a profit). MEG was a deliverer, not a seller, of waste oil and waste water. The court holds, however, that even if the transactions between MEG and BCF could be characterized as sales of goods, BCF's express and implied warranty claims must fail for want of reliance on MEG's affirmations.

### 1.  Express Warranty.

An express warranty is an "affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain." N.Y.U.C.C. Law § 2–313 (McKinney 1997).

Since BCF's unloading ticket and MEG's manifest attests to the non-hazardous nature of the goods delivered, the issue raised is not whether there was an affirmation, but rather whether MEG intended the statements to induce the acceptance of the goods and whether BCF could have relied on them. *See CBS, Inc. v. Ziff–Davis Publ'g,* 75 N.Y.2d 496, 554 N.Y.S.2d 449, 452, 553 N.E.2d 997, 1000 (Ct.App.1990) (discussing the "reliance requirement in actions for breach of express warranties" and finding reliance when the term forms part of the basis of the bargain). According to BCF:

> MEG seeks to make much of the claimed fact that the BCF unloading ticket was not prepared and executed until after Dr. Khurana had apparently analyzed the sample and accepted the April 6 Load.... This argument, however, misperceives the value of the certification to BCF. BCF did not require the signature on the Unloading ticket as some sort of *demonstration* of the actual non-hazardousness of the load .... The certification was [ ] an additional assurance of the acceptability of the product, bottomed on the notion that transporters have an independent obligation to make sure that their shipments do in fact come within the regulatory parameters imposed on them by the DEC pursuant to their own Part 364 permits. *P. BCF's Mem. in Opp. to Def. MEG's Mot. for Summ. J.,* 19.

■ The above argument demonstrates the weakness of BCF's warranty arguments. BCF notes that it did not rely on MEG to demonstrate the actual composition of the load. Indeed, such reliance would be misplaced given that it is Con Edison and BCF, and not the transporter company MEG, which have duties to test the composition of shipments. And, insofar as BCF relies on whatever information can be gleaned from MEG's compliance with its own statutory duties, this reliance is not meaningful because MEG's part 364 permit did not *require* it to test the materials. Finally, BCF's chemist had a "regular practice" of testing materials which came into BCF's facility in order to ensure compliance with statutes and regulations prohibiting BCF from accepting

hazardous material.[8] It is undisputed, however, that BCF's chemist failed to administer the test on the April 6 load from MEG, although BCF personnel did draw a sample of the delivered material and examine it to see if it was waste oil or waste water. BCF's own decision not to test the material does not serve to create a reliance on a transporter company with no obligation of its own to test the material. Thus, BCF's express warranty claim fails on the question of reliance because neither the manifest of MEG (which carried no underlying obligation to test) nor the BCF unloading ticket (which was signed after BCF accepted the shipment and which merely certified that shipments did not "knowingly" contain PCBs) could as a matter of law have formed the basis of BCF's decision to accept the April 6, 1994 delivery.

### 2. Implied Warranty of Fitness for a particular Use.

■ Implied warranty of fitness will not be judicially imposed unless the buyer establishes that the "seller knows or has reason to know the particular purpose for which a buyer requires goods, and also knows or should know that the buyer is relying on his special knowledge." *Abraham v. Volkswagen of America, Inc.,* 795 F.2d 238, 249 (2d Cir. 1986). The reasons that support the need for reliance in the express warranty claim apply with even greater force to the implied warranty claim. In this transaction, it was BCF and not MEG which had the special knowledge of the nature of the liquid waste because it was BCF and not MEG which had the duty to ascertain the nature of the liquid waste. No reasonable juror could find that MEG knew or should have known that BCF was relying on MEG for information about the chemical composition of the liquid waste. As to its claim for breach of implied warranty, BCF could not have relied, as a matter of law, and it certainly could not have *justifiably* relied as a matter of law, on MEG's affirmations.

### III. CONCLUSION

For the reasons set forth above, defendant Miller Environmental Group, Inc.'s (MEG's)

8. *Tr.,* 25.

motion for summary judgment is GRANTED.